DECISION AND JUDGMENT ENTRY
{¶ 1} Appellant, John Leasure, appeals the June 4, 2002 judgment entry of the Lucas County Court of Common Pleas which, following a jury trial, found appellant guilty of kidnapping, in violation of R.C.2905.01(A)(3), and domestic violence, in violation of R.C. 2919.25(A), and sentenced him to five years of community control and a six month prison term, respectively. For the reasons that follow, we affirm the trial court's decision.
 {¶ 2} The relevant facts are as follows. On January 14, 2002, a five count indictment, stemming from events occurring on January 2, 2002, was filed against appellant. Count 1 charged attempted aggravated murder; Count 2, kidnapping; Count 3, domestic violence; Count 4, assault on a peace officer; and Count 5, vandalism. On January 22, 2002, appellant entered a plea of not guilty to the charges.
 {¶ 3} On April 10, 2002, a jury trial commenced and the following relevant testimony was presented. State's witness, Tammy Anderson, testified that she and appellant had a romantic relationship which produced one child, Melody, nine months old on the date of the incident. Anderson also testified that she has two other children, an 18 year-old and an eight year-old.
 {¶ 4} Anderson testified that on January 2, 2002, appellant came to her home while she was installing a hardwood floor. Anderson stated that appellant became angry because she was not paying enough attention to him. Appellant began kicking the dishwasher. Anderson told appellant to stop and he refused. At that point, Anderson testified that she went to the neighbor's house to check on her son who, at some point during the commotion, left Anderson's home. Anderson testified that she left appellant with Melody and that the two were playing together. When Anderson found her son, he had dialed 9-1-1; Anderson took the phone and gave the police her name and address.
 {¶ 5} Anderson then went back to the house because she wanted to get the baby. Anderson testified that she told appellant that she wanted to hold the baby and go outside and smoke a cigarette. Appellant followed Anderson outside. Anderson stated that she first saw the police pull into her neighbor's driveway, which was partially blocked by a row of evergreen trees.
 {¶ 6} Anderson testified that once appellant saw the police he called her a "f***ing bitch" and stated that he would "kill that kid." Anderson began to run with the baby, but soon fell. According to Anderson, she then pulled the baby close because appellant kept yelling that he was going to "kill the kid" and he was trying to take the baby from her.
 {¶ 7} Eventually, appellant was able to take the baby from Anderson. She testified that appellant grabbed the baby by the leg and then dropped her approximately six to seven feet. Anderson testified that appellant was fumbling the baby "like a football"; he kept dropping her and picking her back up. Anderson stated that appellant dropped the baby at least three or four times, picking her back up by an arm or leg.
 {¶ 8} Anderson testified that at that point, an officer approached and told appellant to step away from the baby; the officer then tackled appellant and they were wrestling on the ground. The baby was underneath appellant. Anderson stated that another officer arrived and they were both trying to get appellant under control when she was able to pull the baby out from under him.
 {¶ 9} As to her injuries caused during the struggle, Anderson testified that she had a "big knot" on her face and that her "whole body was just hurting." Anderson stated that the baby did not have any long term injuries and was able to leave the hospital that evening. Photographs of Anderson's and Melody's injuries were admitted into evidence.
 {¶ 10} During cross-examination, Anderson stated that appellant did not deliberately drop Melody, he was just trying to get the baby from her. She indicated that appellant was not trying to hurt the baby.
 {¶ 11} Anderson testified that the first officer on the scene tackled appellant, but that appellant did not punch the officer in the face and appellant did not throw any punches or kick. The second officer arrived and, as did the first officer, got on top of appellant. Anderson stated that at this point, the baby was underneath appellant and that she did not know if appellant was purposely on top of the baby. When asked whether appellant punched her, Anderson responded negatively.
 {¶ 12} According to Anderson, at some point after retrieving the baby from underneath appellant, a sheriff's deputy took the baby from her and began taunting appellant with the baby. Anderson stated that the officer was supposed to be taking Melody to the ambulance and, instead, was putting the baby in appellant's "face."
 {¶ 13} Regarding Melody's injuries, Anderson explained that the scratches on her face and neck healed in a couple of days. She stated that Melody had a "little black eye on top of her one eyelid" which remained for about one week.
 {¶ 14} The state then conducted further questioning of Anderson. She stated that when appellant was yelling that he was going to "kill that f***ing kid," she believed him. Anderson also stated that when appellant was struggling with the officer he was acting like "an animal, a beast."
 {¶ 15} Anderson testified that on the date of the incident, the deputies had her write out a report of events. The handwritten report consisted of four pages and was completed two to three hours after the incident. Anderson read aloud the portion where she wrote: "[Appellant] actually rolled on top of the baby intentionally trying to smash her, suffocate her with his body." During recross examination, appellant agreed that when she wrote the statement she was very angry with appellant.
 {¶ 16} Lucas County Sheriff's Deputy Dennis Gene Wilichowski testified next. Deputy Wilichowski testified that he responded to a domestic violence call at Anderson's home, which is approximately one quarter of a mile from the sheriff's substation. Deputy Wilichowski testified that he had difficulty finding the house and pulled into the driveway next door.
 {¶ 17} Immediately upon his arrival, Wilichowski saw a small boy running up and pointing to the adjacent yard. Deputy Wilichowski stated that he observed a woman on the ground trying to hold on to a baby and a man trying to pull the baby away. Wilichowski testified that he saw appellant strike Anderson in the face and take control of the baby.
 {¶ 18} Wilichowski testified that he ordered appellant to give him the baby and appellant refused to comply. At that point, Wilichowski hit appellant on the side of the face and brought him down to the ground. Wilichowski testified that his goal was to get the baby away from appellant, and that appellant had the baby underneath his body.
 {¶ 19} Wilichowski testified that appellant began hitting him in the face. A photograph depicting Wilichowski's injuries was admitted into evidence; Wilichowski testified that the photograph truly and accurately depicted his injuries. Wilichowski stated that he was scratched around his nose and mouth and punched several times in the mouth.
 {¶ 20} Another officer arrived and, according to Wilichowski, they "got somewhat control of him." Wilichowski testified that it ultimately took four deputies to get appellant handcuffed; he was then placed in the back of Wilichowski's patrol car.
 {¶ 21} Wilichowski testified that he began walking away from the patrol car when the rear driver's window was kicked out by appellant. Appellant also bent the window frame. Appellant was finally subdued by the use of mace.
 {¶ 22} Wilichowski attempted to testify as to the cruiser's repair estimate, but the hearsay objection was sustained. Wilichowski did state that the car was out of service for approximately two weeks.
 {¶ 23} During cross-examination, Wilichowski was questioned as to why he did not have a "fat lip" or any marks on his face (other than the scratches) despite his testimony that appellant punched him in the face several times. Wilichowski testified that in his experience it depends on how hard an individual was hit as to whether there would be telltale marks.
 {¶ 24} Lucas County Sheriff's Deputy James Ceglio testified that he was the second deputy to arrive at the Anderson home. Ceglio testified that he immediately observed appellant and Wilichowski fighting, standing face to face. Ceglio saw appellant and Wilichowski go down on the ground, and observed Anderson screaming and yelling "give me back my baby." At that point Ceglio had not seen the baby.
 {¶ 25} Ceglio testified that Wilichowski was "screaming for help" and that he indicated that appellant was "laying on a baby." Ceglio stated that at that point he observed the baby underneath appellant's body. Ceglio called for back-up assistance on his portable radio.
 {¶ 26} Ceglio stated that, after the other officers arrived, they were able to roll appellant off the baby but that appellant was not cooperative, he kept putting "pressure down, body pressure." Ceglio also testified that he witnessed appellant kick out the rear window of the police cruiser and that, thereafter, appellant was chemically maced. Ceglio specifically testified that appellant was not maced until he was in the vehicle.
 {¶ 27} Lucas County Sheriff's Sergeant Gary Heil (retired on the date of trial) testified that he and Sergeant Schiavone responded to an officer's radio call for help. When he arrived on the scene he observed two officers "wrestling" with appellant. Heil testified that he took control of the baby, which was then with Tammy Anderson, because he feared for the baby's safety. Heil described the condition of the baby as "dirty, disheveled, had possible bruising." Heil stated that he held her until the rescue squad arrived.
 {¶ 28} The state's final witness was Lucas County Sheriff's Sergeant James Schiavone. Sergeant Schiavone testified that when he arrived at the Anderson home, three deputies were struggling to get appellant handcuffed. Schiavone stated that he placed his knee in the middle of appellant's back and cuffed appellant's right hand; he was then able to get appellant's left hand cuffed. At this point, Schiavone explained, the baby had already been removed from the fracas.
 {¶ 29} Schiavone stated that once in the cruiser, appellant kicked out the window. Schiavone threatened appellant with mace if he did not stop kicking. Appellant then knocked the door frame loose and Schiavone used about three or four shots of mace from his container. Schiavone testified that his mace was a foam style and, that because appellant was "thrashing around so much," he was unable to hit him. Schiavone then used Wilichowski's mace container to chemically restrain him.
 {¶ 30} At the close of the state's case, appellant's counsel made a Crim.R. 29 motion for acquittal as to all five counts. The trial court granted appellant's motion on the vandalism charge finding that the testimony as to the monetary amount of damage was insufficient.
 {¶ 31} Appellant then presented his case. Jamie Sorosiak testified that on the date of the incident, he owned Buckeye Electric and was working in a new subdivision off Angola Road. Sorosiak stated that he and another individual were pulling out of the subdivision and saw "a bunch of officers" across the street. Sorosiak testified that he saw Deputy Heil holding a baby and "sticking it in John's face." Sorosiak also testified that he observed the officers spraying appellant with mace while they had him on the ground. Sorosiak testified that he did not get out of his vehicle.
 {¶ 32} During cross-examination, Sorosiak indicated that he knew appellant from high school. Sorosiak also stated that he is friends with Tammy Anderson's brother.
 {¶ 33} Clint McLaughlin testified next. McLaughlin testified that he is an employee of Buckeye Electric and was in the vehicle with Sorosiak. McLaughlin also testified that appellant was maced while on the ground and that a sheriff held the baby in front of appellant. McLaughlin testified that he saw the deputies pull appellant out of the house. McLaughlin further stated that he and Sorosiak got out of the car in the neighbor's driveway and watched from the neighbor's side yard.
 {¶ 34} Following jury deliberations, appellant was found guilty of kidnapping and domestic violence.[1] This appeal followed.
 {¶ 35} Appellant presents the following four assignments of error:
 {¶ 36} "Assignment of Error No. 1
 {¶ 37} "Appellant was denied his due process rights when he was convicted of kidnapping with purpose to terrorize on insufficient evidence that he had purpose to terrorize.
 {¶ 38} "Assignment of Error No. 2
 {¶ 39} "Appellant's conviction of kidnapping with purpose to terrorize is against the manifest weight of the evidence.
 {¶ 40} "Assignment of Error No. 3
 {¶ 41} "The trial court erred in charging the jury on domestic violence, R.C. 2919.25(C), as it is not a lesser included offense of domestic violence, R.C. 2919.25(A).
 {¶ 42} "Assignment of Error No. 4
 {¶ 43} "Appellant's conviction of the greater offense of domestic violence is against the manifest weight of the evidence."
 {¶ 44} In his first assignment of error, appellant argues that the evidence presented at trial was insufficient to support a kidnapping conviction. Specifically, appellant contends that the evidence was insufficient to prove that he acted with purpose to terrorize Tammy Anderson.
 {¶ 45} "When reviewing a claim of insufficient evidence, the relevant inquiry is whether any rational factfinder, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Moore
(1998), 81 Ohio St.3d 22, 40, citing Jackson v. Virginia (1979),443 U.S. 307, 319; State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not have reached the conclusion reached by the trier of fact." Id., citing Jenks at 273.
 {¶ 46} In order to be convicted of kidnapping, under R.C.2905.01(A)(3), the state must prove beyond a reasonable doubt that appellant, by any means, removed Melody from Anderson for the purpose of terrorizing Anderson. Appellant contends that the evidence presented at trial was insufficient to establish that appellant's purpose was to terrorize Anderson.
 {¶ 47} Appellant and the state agree that the term "terrorize" is not defined in the Ohio Revised Code.[2] Further, the Eighth and Tenth Appellate Districts, as cited by the state, have explained that the term "terrorize" is not a legal term and that a jury is presumed to know the meaning of common words. State v. Canter, 10th Dist. No. 01AP-531;2002-Ohio-1347, citing State v. Carter (Nov. 14, 1991), 8th Dist. No. 59223. "Terrorize" is defined as: "to fill with terror or anxiety." Merriam Webster's Collegiate Dictionary (10th Ed. 1996) 1217.
 {¶ 48} In support of appellant's argument that the evidence in this case was insufficient to establish purpose to terrorize, appellant cites cases which upheld kidnapping convictions.[3] The cases cited by appellant are distinguishable in that none of them involve minors under the age of thirteen. Thus, unlike the case before us, those cases required that, in order to establish a kidnapping, the state prove the additional element of "force, threat or deception"; it is easy to conceive how such acts would lend to a more violent or extreme fact scenario.
 {¶ 49} In the present case, Anderson testified once appellant realized that she had called the police, he began yelling that he was going to "kill that kid." When he was grabbing for Melody he continued to yell, "I'll kill that kid." Anderson testified that, at that time, she believed his threat. Once he gained control of the baby, appellant was fumbling her "like a football"; he kept dropping Melody and picking her back up by a leg or an arm. Thereafter, appellant was on the ground with the baby underneath him. Though somewhat inconsistent with her trial testimony, Anderson's written statement, completed just hours after the incident, provided: "[Appellant] actually rolled on top of baby intentionally trying to smash her, suffocate her with his body." Further, Deputy Ceglio testified that when they were trying to remove appellant from on top of the baby, appellant was pressing down with his body.
 {¶ 50} Based on the foregoing, we find that sufficient evidence was presented by the state to support appellant's kidnapping conviction. We further find that a rational factfinder could have found the essential elements of kidnapping, particularly the "terrorize another" language, proven beyond a reasonable doubt. Accordingly, appellant's first assignment of error is not well-taken.
 {¶ 51} In appellant's second assignment of error, appellant contends that his kidnapping conviction is against the manifest weight of the evidence. In State v. Thompkins (1997), 78 Ohio St.3d 380, 386, the Ohio Supreme Court stated that the "legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." The court explained that while an appellate court may determine that a judgment is sustained by sufficient evidence, it may still conclude that the judgment is against the weight of the evidence. (Citation omitted.) Id. at 387.
 {¶ 52} In contrast to sufficiency, the court stated the following in regard to weight of the evidence:
 "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'" (Citation omitted.) (Emphasis in original.) Id. at 387.
 {¶ 53} The Ohio Supreme Court also noted that when an appellate court reverses a verdict as against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and "disagrees with the factfinder's resolution of the conflicting testimony." Id. In reviewing the entire record, an appellate court:
 {¶ 54} "`weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Id., quoting State v.Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 55} Upon careful review of all the evidence presented in this case, we cannot say that the jury lost its way and created a manifest miscarriage of justice. Thus, appellant's kidnapping conviction is not against the manifest weight of the evidence and appellant's second assignment of error is not well-taken.
 {¶ 56} Appellant's third and fourth assignments of error concern his conviction for domestic violence. In appellant's third assignment of error, he argues that the trial court erred in instructing the jury on domestic violence, under R.C. 2919.25(C), as it is not a lesser included offense of domestic violence, under R.C. 2919.25(A). Appellant's fourth assignment of error contends that his conviction under R.C. 2919.25(A), the greater domestic violence offense, is against the manifest weight of the evidence. We shall address appellant's fourth assignment of error first as it is dispositive.
 {¶ 57} In appellant's fourth assignment of error, he argues that because, during her testimony, Anderson denied that appellant punched her in the face his conviction for domestic violence was against the weight of the evidence. Anderson did testify that she had a "big knot on her face" but she did not know how she got it because, at the time, she was more worried about the baby. Further, Deputy Wilichowski testified that he saw appellant strike Anderson in the face while they were struggling for control of Melody. As set forth above, in order for an appellate court to reverse to reverse a conviction as being against the manifest weight of the evidence, the court must disagree with the "factfinder's resolution of the conflicting testimony." Thompkins, supra. Based upon our review of the evidence, we cannot say that the jury lost its way when it convicted appellant of domestic violence. Appellant's fourth assignment of error is not well-taken.
 {¶ 58} Based upon our resolution of appellant's fourth assignment of error, we find that any error in instructing the jury on the less serious domestic violence charge was harmless. Accordingly, appellant's third assignment of error is moot and not well-taken.
 {¶ 59} On consideration whereof, we find that appellant was not prejudiced or prevented from having a fair trial, and the judgment of the Lucas County Court of Common Pleas is affirmed. Costs of this appeal are assessed to appellant.
JUDGMENT AFFIRMED.
[1] Appellant was acquitted of the attempted aggravated murder and assault on a peace officer charges.
[2] Appellant does cite to various Revised Code sections attempting to glean the meaning of the term "terrorize."
[3] Appellant cites, inter alia: State v. Fahringer (May 11, 2000), 3rd Dist. No. 4-99-14 (victim was beaten, tied with a rope, and thrown into the back of a pick-up truck) and State v. Blunt (Aug. 31, 1989), 10th Dist. No. 88AP-933 (substantial evidence existed that the victim was forced into a house against her will and that the defendant held a pocketknife to her neck.)